Filed 8/31/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re DEANDRE LAMAR MOORE on Habeas Corpus. | A154032 (San Mateo County Super. Ct. No. SC-31458-B) |

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), the California Supreme Court examined the felony-murder special circumstance under Penal Code section 190.2, subdivision (d).[1]  Under that subdivision, a person who is guilty of murder but is not the "actual killer" and who aids or abets the commission of certain felonies that result in death may be sentenced to death or life without the possibility of parole if that person is a "major participant" and acts with "reckless indifference to human life . . . ."  (§ 190.2, subd (d).)  In construing subdivision (d), *Banks* and *Clark* narrowed the circumstances under which a person may qualify for the felony-murder special circumstance.

Since *Banks* and *Clark* were decided, many defendants have filed habeas corpus petitions, challenging the sufficiency of the evidence supporting their felony-murder special-circumstance findings.  In a number of those cases, the Courts of Appeal have summarily denied the petition only

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

to have our high court issue an order to show cause requiring them to reconsider their summary denials under *Banks* and *Clark*.

That is what happened here. A jury convicted petitioner Deandre Moore of, among other things, murder (§ 187) and robbery (§ 211) and found true the special circumstance that the murder was committed during a robbery (§ 190.2, subd. (a)(17)). Citing *Banks*, Moore filed a petition for writ of habeas corpus with this court, challenging the sufficiency of the evidence for the robbery-murder special-circumstance finding—which we summarily denied. The California Supreme Court then issued an order to show cause why Moore is not entitled to the relief he requested in his petition. Our high court also ordered this court to consider "whether [Moore's] youth at the time of the offense should be one of the factors considered under" *Banks* and *Clark*.

We now conclude that a defendant's youth at the time of the offense should be a factor in determining whether that defendant acted with reckless indifference to human life under section 190.2, subdivision (d). Considering the totality of the circumstances, including the fact that Moore was only 16 at the time of his offenses, in light of *Banks*, *Clark*, and their progeny, we find insufficient evidence to establish that Moore acted with the requisite reckless indifference to human life. We therefore vacate the robbery-murder special-circumstance finding and remand this case for resentencing.

## BACKGROUND

### A.    Facts[2]

On the evening of December 3, 1991, codefendants Athain Russell and Moore (collectively, defendants),[3] together with an accomplice, Brian Winston, stole a car from the parking lot of the Fashion Fair mall in Fresno. The trio drove through the mall parking lot until they spotted Robert Luecke, who was getting out of a parked car with his fiancée and younger sister. One of the defendants—presumably Russell—got out of the stolen car and robbed Luecke and his fiancée at gunpoint. After Luecke and his fiancée handed over their valuables, Russell, without provocation, fired two shots at Luecke at close range. One shot from the .22-caliber handgun hit Luecke's chest and passed through his heart, killing him.

#### 1.    The Shooting

Lonnie Packard testified in exchange for the prosecution's promise to dismiss burglary charges that were pending against him. According to Packard, on the late afternoon or early evening of December 3, 1991, he was driving on Geneva Street in Fresno, looking to purchase "rock cocaine." While he was there, Russell, whom Packard knew, approached his vehicle and told Packard he would pay for a ride across town. Packard agreed to give him a ride. Russell and his companion, Winston, then got into Packard's station wagon. At Russell's request, Packard drove to several locations in an attempt to find Moore. Eventually, they found him standing in front of a

---

[2] The facts of this case were set forth in our unpublished opinion in the direct appeal. We reiterate these facts where relevant to the petition but also add additional facts from the record where necessary. We also grant Moore's unopposed request for judicial notice of the record in the direct appeal (case No. A064703).

[3] Moore and Russell were tried together.

3

residence on Geneva.  Russell invited Moore to go with them across town to steal a vehicle.  Moore agreed and got into Packard's car.

On the way across town, Packard stopped at an auto parts store to allow Moore, Russell, and Winston to purchase a "dent puller" and a pair of gloves to use in the auto theft.[4]  Packard then drove them directly to the Fresno Fashion Fair mall.  Packard stopped in the parking lot while Russell, Moore, and Winston discussed what kind of car they wanted to steal.  They also discussed carjacking a vehicle, but Packard said they were crazy and he would have no part of that.  However, the three others agreed it would be a good idea to try a carjacking.

Packard then drove through the parking lot to the back side of Macy's.  The other three continued to discuss what kind of car they wanted to steal.  Eventually, Moore saw a car he wanted—a blue, two-door Mazda 626—and told Packard to pull over.  Moore took the dent puller and quickly broke into the Mazda.  When the Mazda's headlights came on, Russell and Winston left Packard's car and got into the Mazda with Moore.  Packard had seen a handgun on the front passenger seat floor of his car while Moore, Russell, and Winston were in the car.  After the three young men left, Packard noticed the gun was gone.

About the same time Moore, Russell, and Winston were stealing the Mazda, Luecke, his 13-year-old sister K.L., and his fiancée Mari G. were finishing up dinner at a restaurant in the Fashion Fair mall (6:30–7:00 p.m.).  They walked out to Mari G.'s car, and Luecke drove them around the other side of the mall to go shopping at Macy's.  They drove down a driveway that

---

[4] Packard's friend Sarah U. was with the group for part of the ride across town.  However, she left the group before they went to the auto parts store.

ran directly in front of Macy's and turned right down a parking aisle where the parking spaces angled away from Macy's. As they drove down the aisle, Mari G. noticed a car behind them. Although that car was going slowly, it did not pull into an empty parking space near the one where Luecke parked.

A few moments later, as the victims were getting ready to leave their car, Mari G. noticed the car that had been following them parked a few car lengths away. The car was facing the wrong direction in the one-way aisle. Mari G. mentioned to Luecke there were people in the car looking at them and said she thought they might be intending to steal a car. As a precaution, Luecke put a "club" type antitheft device on the steering wheel and took the car's portable CD player with him.

Luecke and his companions then left their car. As they did so, the suspicious car pulled up and a young, tall Black man got out of the passenger side. He approached Mari G., pointed a handgun at her, and demanded her wallet. Mari G. handed her entire purse to the gunman. The gunman then moved on to Luecke and demanded his wallet. Luecke handed over his wallet, as well as the bag containing the CD player he was carrying.

After surrendering his wallet, Luecke slowly backed away from the gunman with his hands up. When he stopped, the gunman fired a single shot at Luecke's chest. The gunman started to move backward but then took a step forward and shot at Luecke a second time, this time aiming downward. After he fired the second shot, the gunman returned to his car and got into the back seat. The car drove away.

Mari G. immediately ran into Macy's for help, while K.L. stayed with Luecke. An ambulance took Luecke to a local hospital. Doctors pronounced him dead shortly after he arrived. An autopsy revealed that a single small-

caliber bullet struck Luecke in the chest and passed through his heart, killing him. The pathologist recovered the bullet from Luecke's body.

At trial, Mari G. identified Moore as the triggerman. However, other witnesses who were in the parking lot and had observed the shooting described the assailant as a "tall" Black man. Moore was only 5' 6" tall, while Russell was 6' 1" tall at the time of the shooting. Several of the witnesses agreed the gunman was wearing a long, black parka inscribed with a sports insignia.

Shortly after the shooting, a witness observed a blue car stopped behind her car at a red light. The car had almost rear-ended her before stopping. Looking into her rear-view mirror, the witness saw three young Black men laughing. The witness identified Moore and Russell as two of the young Black men in the blue car.

The day after the shooting, Packard saw Russell on Geneva Street. He asked him if they had "done" the shooting at the Fashion Fair mall. Russell said they had. According to Packard, Russell seemed "happy" about it.

2.     Investigation

A witness who observed the shooting tried to memorize the license plate number of the assailant's car. That number was communicated to the police. In the meantime, the owner of the stolen blue Mazda—Mary H.—called the police to report that her car had been stolen from the Fashion Fair parking lot. An officer who responded to the scene of the shooting noticed that the license plate number of the gunman's vehicle was similar to the license plate number of Mary H.'s stolen vehicle. This information was broadcast over police channels. The broadcast specified that Mary H.'s car was a suspect vehicle in the Fashion Fair murder.

About 9:20 p.m., Fresno police officers spotted Mary H.'s stolen car. The car was parked on the side of a road about seven miles from the Fashion Fair mall. When the police found the car, its engine was still running. The passenger side door lock and the ignition had been "punched"; that is, they had been forcibly removed with a tool. Inside the car, the police found a dent puller, .22-caliber shell casings, live .22 bullets, a compact disc carrier, a paycheck stub and deposit slip in the name of Mari G., a receipt in the name of Luecke, and a program for a play that Mary H. had left in the car.

The police lifted a latent palmprint from the play program they found in the car and determined that Winston had left the print. A week after the murder, the police arrested Winston and questioned him concerning the Fashion Fair shooting. Winston denied involvement and said he was with Moore and Russell on the evening of the murder when some other persons drove up in a stolen Mazda. Winston said Moore and Russell would back up his story. The next day, the police questioned—but did not arrest—Moore and Russell. Although both denied being involved in the murder, neither fully corroborated Winston's story.

A few days later, Packard, who was in custody for a commercial burglary, had his attorney contact the police to let them know he had information concerning the Fashion Fair shooting. The prosecutor agreed to dismiss the burglary charge in exchange for Packard's "truthful testimony" concerning the homicide. The prosecutor did not provide Packard with immunity for the robbery-homicide and indicated that if the evidence showed Packard "was involved in the actual robbery/homicide" then the "deal . . . would be off." Packard told the police about his involvement in the theft of Mary H.'s Mazda and gave the police information which allowed them to find the gun used in the homicide. Specifically, Packard said Russell gave the gun

to Packard's son; Packard in turn pawned it to the owner of a wrecking yard. The police located the gun—a .22-caliber semiautomatic—and determined that the bullet retrieved from Luecke's body had been fired from that weapon.

Armed with this new information, the police arrested Moore and Russell. They questioned Moore first. He initially denied any involvement in the shooting. Eventually, however, the police showed Moore the murder weapon, and shortly thereafter, Moore confessed. He stated that a "dude" in a station wagon gave him a ride to the Fashion Fair mall. There, Moore stole a blue car. He admitted that while he was driving the vehicle "the robbery [and] shooting occurred," but he claimed he was only responsible for stealing the car.

The police also interviewed Russell. Russell waived his *Miranda* rights and initially told the police he was not involved in the robbery or shooting. However, after the police showed Russell the murder weapon, he eventually confessed. Russell said he had gotten a ride to the Fashion Fair mall with a "dude" whose name he did not know. Russell admitted he stole a car at the mall. While he was driving in the Fashion Fair parking lot, he saw a man get out of a car with some girls. Russell got out of the stolen car and robbed the man and the girls at gunpoint. According to Russell, the victims threw the purse, wallet, and CD player onto the ground. As Russell was picking these items up, the male victim appeared to reach into his rear pocket. Russell panicked and started shooting. He believed he fired three or four times but was not sure. Russell then got into the back seat of the stolen car, and the car drove away.

After Russell confessed, the police allowed his mother to speak with him alone in the interview room. That conversation was taped and played for the jury. In the conversation, Russell admitted he shot Luecke; however, his

mother tried to convince Russell not to plead guilty. After Russell's mother left the interview room, Russell changed his story to indicate he was only driving the stolen car.

The police searched Russell's room and seized a "three-quarter length" Los Angeles Kings jacket. The police also found a .22-caliber shell casing inside Winston's house.

On December 18, 1991, the Fresno police conducted two live lineups. One contained Moore and one contained Russell. Of the seven people who viewed the lineups, only Mari G. picked Russell out of a lineup. She stated he was the shooter. She was only certain to a level of seven out of ten because the person she picked had a mustache which he did not have on the night of the crime. Neither Mari G. nor any other witness picked Moore out of his lineup. At the preliminary hearing, Mari G. again identified Russell as the shooter. However, at trial, she identified Moore as the person with the gun.

## B.    Procedural History

A jury convicted Moore and Russell of first degree murder (Pen. Code, § 187), robbery (Pen. Code, § 211), and auto theft (Veh. Code, § 10851). The jury also found that Moore was armed with a firearm while committing the robbery and murder (Pen. Code, § 12022, subd. (a)) but did not find that Russell personally used a firearm in committing those crimes (Pen. Code, § 12022.5). Finally, the jury found true the special circumstance that Moore and Russell committed the murder during the course of a robbery. (Pen. Code, § 190.2, subd. (a)(17).) Pursuant to Penal Code section 190.5,[5] the trial

---

[5] Under section 190.5, subdivision (b) as construed at the time of Moore's sentencing, "16- or 17-year-olds who commit special circumstance murder *must* be sentenced to LWOP [life without parole], *unless* the court, in its discretion, finds good reason to choose the less severe sentence of 25 years

court sentenced Moore and Russell to life without the possibility of parole. It also imposed concurrent terms for their other offenses and enhancements.

This division affirmed the judgment in an unpublished opinion. (*People v. Moore* (Sept. 24, 1996, A064703) p. 51.) In finding sufficient evidence to support the robbery-murder special-circumstance finding against Moore, we initially concluded that "[t]he jury could reasonably infer Moore *knew* Russell was armed with a handgun before they committed the car theft and robbery" and "anticipated the group would be attempting an armed robbery of some sort in the parking lot." (*Ibid.*) We also found sufficient evidence that "Moore was a 'major participant' in the robbery." As we explained: "Moore admitted he was driving the stolen Mazda. The evidence would support a finding Moore was 'stalking' Luecke and his companions. He followed them down a parking aisle, passed them, and then turned around to wait until they got out of their car. When the victims left their vehicle, Moore pounced, driving up to them and allowing Russell to get out of the car to commit the robbery. He then acted as the getaway driver after the robbery and shooting." (*Ibid.*) Finally, we found sufficient evidence of reckless indifference to human life because "the facts support an inference that Moore 'anticipated that lethal force would or might be used if necessary to effectuate the robbery or a safe escape.' " (*Id.* at p. 52.)

After *Banks* was decided, Moore filed a petition for writ of habeas corpus with the trial court, challenging the sufficiency of the evidence for the robbery-murder special-circumstance finding. The trial court denied the petition, and Moore appealed. At Moore's request, this court dismissed the appeal.

---

to life." (*People v. Guinn* (1994) 28 Cal.App.4th 1130, 1141, disapproved by *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1387.)

Moore then filed the instant petition. After this court summarily denied the petition, our high court issued an order to show cause "why [Moore] is not entitled to relief based on his claim that there was insufficient evidence to support the robbery-murder special circumstance finding and whether [Moore's] youth at the time of the offense should be one of the factors considered under" *Clark* and *Banks*.

## DISCUSSION

Because Moore was not the "actual killer,"[6] the robbery-murder special-circumstance finding may be upheld only if there is substantial evidence that Moore was a "major participant" in the criminal activities and that he acted with "reckless indifference to human life . . . ." (§ 190.2, subd. (d).) Relying on *Banks* and *Clark*, Moore contends the evidence was not sufficient to establish either element. We conclude that he is correct as to the required mental state and vacate the robbery-murder special-circumstance finding on that ground. As a result, we do not decide whether the evidence is sufficient to establish that Moore was a major participant.

A.    ***Banks*, *Clark*, and Their Progeny**

Section 190.2, subdivision (d) states in relevant part that "every person, not the actual killer, who, with reckless indifference to human life and as a

---

[6] At trial, Mari G. identified Moore as the shooter even though she had identified Russell as the shooter in a lineup and at the preliminary hearing. Mari G.'s identification at trial was the *only* evidence suggesting that Moore was the shooter; "[a]ll other evidence suggested Russell was the gunman." (*People v. Moore, supra*, A064703, at p. 23.) Indeed, the prosecution argued at closing that Russell was the killer and conceded that Moore was the driver, that he "didn't do the shooting," and that he "didn't get out of the car and take the property . . . ." In their return, the People do not argue that Moore was the shooter. Thus, we do not consider Moore to be the actual killer for purposes of this petition. (See *Banks, supra*, 61 Cal.4th at p. 804 [substantial evidence must be " ' "reasonable, credible, and of solid value" ' "].)

11

major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4." By its terms, subdivision (d) "imposes both a special actus reus requirement, major participation in the crime, and a specific mens rea requirement, reckless indifference to human life." (*Banks, supra*, 61 Cal.4th at pp. 798–799.)

In *Banks, supra*, 61 Cal.4th at page 794, the California Supreme Court examined "under what circumstances an accomplice who lacks the intent to kill may qualify" for the death penalty or life without the possibility of parole under section 190.2, subdivision (d). (See *Banks*, at p. 804 ["we note the standards we articulate . . . apply equally to cases . . . involving statutory eligibility under section 190.2(d) for life imprisonment without parole"].) Concluding that subdivision (d) codified "the holding[s] of *Tison v. Arizona* (1987) 481 U.S. 137 . . . and a prior decision on which it is based, *Enmund v. Florida* (1982) 458 U.S. 782" (*Banks*, at p. 794), our high court used these two cases to define the "spectrum" of "felony-murder participants" (*id.* at p. 800). "At one extreme were people like '[Earl] Enmund himself: the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state.' " (*Ibid.*, quoting *Tison v. Arizona* (1987) 481 U.S. 137, 149 (*Tison*).) Thus, a defendant who was merely the "getaway driver in an armed robbery" that resulted in death did not qualify for the death penalty. (*In re Scoggins* (2020) 9 Cal.5th 667, 675–676

12

(*Scoggins*).) By contrast, "actual killers and those who attempted or intended to kill"—who represent "the other extreme"—do. (*Banks*, at p. 800.)

According to our high court, the U.S. Supreme Court in *Tison* "addressed the gray area in between, the proportionality of capital punishment for felony-murder participants, who . . . fell 'into neither of these neat categories.' " (*Banks, supra*, 61 Cal.4th at p. 800.) The defendants in *Tison* "helped plan and carry out the escape of two convicted murderers from prison—one of whom . . . was serving a life sentence for killing a guard in the course of a previous escape." (*Banks*, at p. 802.) "This entailed their bringing a cache of weapons to prison, arming both murderers, and holding at gunpoint guards and visitors alike." (*Ibid.*) During their escape, the defendants robbed an " 'innocent family' " and "held them at gunpoint while the two murderers deliberated whether the family should live or die, then stood by while all four members were shot." (*Ibid.*) Based on these facts, the U.S. Supreme Court found that subjecting the *Tison* defendants to the death penalty was constitutional because they were "actively involved in every element of the kidnapping-robbery" and were "physically present during the entire sequence of criminal activity culminating in the murder of the Lyons family and the subsequent flight." (*Tison, supra*, 481 U.S. at p. 158.)

To determine where on the spectrum between *Enmund* and *Tison* the conduct of a defendant guilty of felony murder falls, *Banks* identified various factors that "may play a role . . . ." (*Banks, supra*, 61 Cal.4th at p. 803.) Those factors include: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was

13

the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?" (*Ibid.*, fn. omitted.)  "No one of these considerations is necessary, nor is any one of them necessarily sufficient" to establish that a defendant is a major participant under section 190.2, subdivision (d).  (*Banks*, at p. 803.)  Instead, courts must "consider the totality of the circumstances."  (*Id.* at p. 802.)

Banks also discussed the evidence necessary to establish reckless indifference to human life, the mental state required under section 190.2, subdivision (d).  As our high court explained, "[a]wareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; only knowingly creating a 'grave risk of death' satisfies the constitutional minimum." (*Banks, supra*, 61 Cal.4th at p. 808.)  Thus, defendants "who simply had awareness their confederates were armed and armed robberies carried a risk of death . . . lack the requisite reckless indifference to human life." (*Id.* at p. 809.)

Applying these principles, our high court found insufficient evidence to support the felony-murder special-circumstance finding in *Banks*.  Although the evidence established that the defendant was "the getaway driver for an armed robbery" (*Banks, supra*, 61 Cal.4th at pp. 804–805), there was no evidence that he was involved "in planning the robbery," that he supplied the gun, that he knew about the violent tendencies of his confederates, that he was physically present during the robbery, or that he "saw or heard" the shooting (*id.* at p. 805).  Our high court therefore concluded that the defendant "cannot qualify as a major participant" and that he did not know "his own actions would involve a grave risk of death." (*Id.* at p. 807.)

14

Less than a year later, the California Supreme Court elaborated on the mental state required under section 190.2, subdivision (d) in *Clark*. According to our high court, reckless indifference to human life "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark, supra*, 63 Cal.4th at pp. 616–617.) Although it "may be 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death'" (*id.* at p. 616, quoting *Tison, supra*, 481 U.S. at p. 157), engaging in "armed robbery, by itself, did not qualify" (*Clark*, at p. 615).

In defining reckless indifference to human life, *Clark* adopted the Model Penal Code definition. (*Clark, supra*, 63 Cal.4th at p. 617, fn. 73.) Thus, reckless indifference "has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' [Citations.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement. [Citation.] Notably, 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human

15

life." (*Scoggins, supra*, 9 Cal.5th at p. 677, quoting *Clark, supra*, 63 Cal.4th at pp. 617, 623, and *Banks, supra*, 61 Cal.4th at pp. 801, 808.)

*Clark* also identified various factors that may play a role in determining whether a defendant acted with reckless indifference to human life. Those "factors include: Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins, supra*, 9 Cal.5th at p. 677.) And like "the factors concerning major participant status in *Banks*, '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark, supra*, 63 Cal.4th at p. 618.)

Considering these factors, our high court vacated the felony-murder special-circumstance finding in *Clark*. Although the defendant "was the principal planner and instigator of the robbery" (*Clark, supra*, 63 Cal.4th at p. 622) and was aware that his confederate had a gun (*id.* at p. 613), he did not instruct his confederate "to use lethal force" (*ibid.*) and had no opportunity "to intervene to prevent [the victim's] killing" (*ibid.*). There was also no evidence that the shooter "was known to have a propensity for violence, let alone evidence indicating that [the] defendant was aware of such a propensity." (*Id.* at p. 621.) Finally, the defendant made some effort to minimize the risk of violence by planning the robbery "for after closing time, when most of the store employees were gone." (*Id.* at p. 620.) Based on these considerations, our high court concluded "that there is insufficient evidence to

16

support the inference that [the] defendant was recklessly indifferent to human life." (*Id.* at p. 623.)

More recently, the California Supreme Court discussed the mental state required by section 190.2, subdivision (d) in *Scoggins*. In that case, our high court explained that "a defendant's culpability under the special circumstances statute requires a fact-intensive, individualized inquiry." (*Scoggins, supra*, 9 Cal.5th at p. 683.) The crux of that inquiry is "[t]he degree of risk to human life," and only evidence suggesting an " 'elevated . . . risk . . . beyond those risks inherent in any armed robbery' " is sufficient to establish reckless indifference to human life. (*Id.* at p. 682.)

*Scoggins* also clarified some of the *Clark* factors. For example, our high court observed that "in light of emerging technologies, a defendant who plans and directs a murder from afar may be just as culpable as a defendant who is physically present at the scene of the crime." (*Scoggins, supra*, 9 Cal.5th at p. 679.) But where a defendant "lacked control over" the actions of his or her confederates "once they arrived on the crime scene, especially given how quickly the shooting occurred," and never instructed his or her confederates to kill the victim "under any scenario," that defendant is less culpable because he or she lacked the ability to restrain the crime. (*Ibid.*)

Our high court also explained that "when different inferences may be drawn from the circumstances, the defendant's actions after the shooting may not be very probative of his mental state." (*Scoggins, supra*, 9 Cal.5th at p. 679.) For example, if those actions "might indicate [either] that [the defendant] had anticipated the use of lethal force" or "that he had not planned for his accomplices to kill" the victim, they "do not weigh substantially in favor of a finding of reckless indifference to human life." (*Id.* at p. 680.) Likewise, a defendant's knowledge that his or her confederates

17

"were prone to some degree of violence" and his or her planned "use of violence" are not sufficient to establish reckless indifference where the defendant "planned an *unarmed* robbery and assault." (*Id.* at p. 682.)

As in *Banks* and *Clark*, our high court in *Scoggins* found the evidence insufficient to support the robbery-murder special-circumstance finding. Although the defendant planned the robbery (*Scoggins, supra*, 9 Cal.5th at p. 679), knew about his confederates' violent tendencies (*id.* at p. 681), and instructed them "to 'beat the shit out of' " the victim (*id.* at p. 683), he did not "know that a gun would be used" (*id.* at p. 677), "was not physically present at the crime scene" (*id.* at p. 678), and never instructed his confederates to kill the victim (*id.* at p. 679). Given these mitigating circumstances, the "limited" duration of the interaction between the shooter and the victim (*id.* at p. 680), and the location of the robbery "in a public parking lot during the daytime" (*id.* at p. 683), our high court held that "the evidence in this case 'does not suggest an elevated risk to human life beyond those risks inherent in an unarmed beating and robbery' " (*id.* at p. 682).

Relying on *Banks* and *Clark*, numerous defendants have filed habeas corpus petitions challenging the sufficiency of the evidence supporting their felony-murder special-circumstance findings. In many cases, the Courts of Appeal and superior courts initially denied the writs. (See, e.g., *In re Parrish* (2020) 58 Cal.App.5th 539, 542 (*Parrish*) [Court of Appeal and superior court]; *In re Taylor* (2019) 34 Cal.App.5th 543, 549 (*Taylor*) [Court of Appeal and superior court]; *In re Ramirez* (2019) 32 Cal.App.5th 384, 392 (*Ramirez*) [Court of Appeal and superior court]; *In re Miller* (2017) 14 Cal.App.5th 960, 966 [superior court].) But in a number of those and other cases, our high court has issued orders to show cause why the defendant is not entitled to relief under *Banks* and *Clark*. (See, e.g., *Taylor*, at pp. 549–

18

550; *Ramirez*, at p. 392; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1007 (*Bennett*); *In re Loza* (2017) 10 Cal.App.5th 38, 41–42 (*Loza*).)

In response to these orders to show cause, several Courts of Appeal have recently vacated felony-murder special-circumstance findings. (See, e.g., *Taylor, supra*, 34 Cal.App.5th at pp. 546–547; *Ramirez, supra*, 32 Cal.App.5th at p. 388; *Bennett, supra*, 26 Cal.App.5th at p. 1007; see also *In re Miller, supra*, 14 Cal.App.5th at p. 964.) At least two Courts of Appeal have, however, denied the habeas corpus petition even after our high court issued an order to show cause or transferred the case for reconsideration in light of *Banks* and *Clark*. (See *Parrish, supra*, 58 Cal.App.5th at p. 542; *Loza, supra*, 10 Cal.App.5th at p. 42.) In both of those cases, the defendant supplied the gun used to kill the victim, was physically present during the shooting, and knew about the shooter's propensity for violence. (See *Parrish*, at p. 544; *Loza*, at pp. 53–54.)[7]

---

[7] In other relevant contexts, Courts of Appeal have similarly found that a defendant acted with reckless indifference to human life where the defendant "actively participated in a robbery, wielded a firearm during that robbery, and was present for the shooting . . . ." (*People v. Bradley* (2021) 65 Cal.App.5th 1022, 1036 (*Bradley*); see *People v. Rodriguez* (2021) 66 Cal.App.5th 749, 771–772 [affirming felony-murder special-circumstance finding because the defendant used a gun and shot a victim in a series of robberies, one of which resulted in the shooting death of another victim by his confederate]; *People v. Douglas* (2020) 56 Cal.App.5th 1, 10–11 [affirming denial of § 1170.95 petition because the defendant supplied the gun and was physically "present and in charge during the robbery"]; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089–1090 [affirming denial of § 1170.95 petition because the defendant personally participated in the robbery, used a gun, and was physically present at the shooting]; *People v. Law* (2020) 48 Cal.App.5th 811, 825 ["we are not aware of a single case that concludes a defendant who personally committed a robbery, used a gun, and was present for the shooting did not meet the standard in section 190.2, subdivision (d)"], review granted July 8, 2020, S262490.)

**B.     Moore's Habeas Corpus Claim**

Considering the totality of the circumstances in the light most favorable to the prosecution under *Banks*, *Clark*, and their progeny, we find insufficient evidence that Moore acted with reckless indifference to human life.  We therefore vacate the robbery-murder special-circumstance finding.

"When reviewing a challenge to the sufficiency of the evidence, we ask ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citations.]  Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for ' "substantial evidence—that is, evidence which is reasonable, credible, and of solid value" ' that would support a finding beyond a reasonable doubt.  [Citation.]  These same standards apply to challenges to the evidence underlying a true finding on a special circumstance." (*Banks, supra*, 61 Cal.4th at p. 804.)

Here, the evidence is not sufficient to establish that Moore had the mental state needed for the robbery-murder special-circumstance finding.  This is clear upon consideration of the factors identified in *Clark* together with Moore's youth at the time of his offenses.

As to the *Clark* factors, many suggest that Moore did not act with the requisite reckless indifference to human life.  Although Moore was aware that Russell had a gun,[8] Moore did not use a gun himself, and there was no

---

[8] Moore argues there is insufficient evidence that he knew a gun would be used by Russell.  But as we concluded in the direct appeal, evidence of the gun lying in plain view on the floorboard of Packard's car, Moore's discussion of " 'carjacking' " with Russell and Winston before the robbery, and Moore's recognition of the gun during questioning support the inference Moore knew that Russell would use a gun during the robbery. (*People v. Moore, supra*, A064703, at p. 51.)

evidence he supplied the gun to Russell. As our high court explained in *Clark, supra*, 61 Cal.4th at page 618, this awareness "is not sufficient to establish reckless indifference to human life." (See *Ramirez, supra*, 32 Cal.App.5th at p. 404 [finding that supplying guns to confederates and awareness that they were carrying those guns during the robbery was insufficient to establish reckless indifference].)

Moore's presence during the robbery also does not support a finding of reckless indifference. Although Moore likely saw Russell rob and shoot Luecke while he sat in the stolen Mazda, he never left the car. Thus, he was not "close enough to exercise a restraining effect on the crime or" Russell. (*Ramirez, supra*, 32 Cal.App.5th at p. 405; see *Taylor, supra*, 34 Cal.App.5th at p. 559 [finding fact that the defendant "never got out of the car and had no opportunity to prevent the shooting" "weighs in his favor"].)

The short duration of the robbery and the sudden and unprovoked nature of the shooting reinforce this conclusion. (See *Scoggins, supra*, 9 Cal.5th at p. 679 [finding "how quickly the shooting occurred" suggested that the defendant "lacked control over" the actions of his confederates].) Indeed, the People acknowledge that "it is unlikely [Moore] could have aborted the shooting" once Russell left the car. There is also no evidence that Moore instructed Russell "to use lethal force." (*Clark, supra*, 63 Cal.4th at p. 619.)

Likewise, Moore's decision to drive away with Russell and Winston immediately after the shooting is not sufficient to establish reckless indifference. Because Luecke was accompanied by Mari G. and his younger sister and because there were other people in the parking lot at the time of the shooting, Moore could have reasonably assumed that help would arrive quickly. (See *Clark, supra*, 63 Cal.4th at p. 620 [finding circumstances behind defendant's flight "ambiguous" because he "would have known that

21

help in the form of police intervention was arriving"]; see also *Taylor, supra*, 34 Cal.App.5th at p. 559 ["it appears [defendant] knew help was arriving"].)

Finally, the People concede "there was no evidence that [Moore] knew of past violent activities on the part of Russell."[9] (See *Bennett, supra*, 26 Cal.App.5th at p. 1025 [finding " 'significant' " the lack of evidence that the defendant knew of his confederates' "violent propensities"].) That the robbery and shooting occurred "in a public parking lot, when the possible presence of witnesses might reasonably be thought to" reduce the risk of lethal force, further weighs in Moore's favor. (*Scoggins, supra*, 9 Cal.5th at p. 683; but see *Bradley, supra*, 65 Cal.App.5th at p. 1034 ["The jury could reasonably have concluded the public nature of the robbery and presence of others increased the risk of someone being injured"].)

Nonetheless, the People contend there is ample evidence that Moore acted with reckless indifference to human life. According to the People, Moore "understood the probability that Russell would have to use the gun" when he chose "to take on three victims single-handedly, relying on [the] gun to ensure the success of the robbery." The People also argue that the risk of lethal force was exacerbated because "the victims included an adult male, who could be expected to resist a robbery attempt, and perhaps to feel compelled to protect the females in his company"—which included a 13-year-old. Finally, the People cite Moore's role in planning the robbery, his failure to aid the victims, and his laughter with his confederates soon after the shooting.

---

[9] At the trial court hearing on Moore's habeas corpus petition, the prosecution argued that Moore was aware of Russell's violent propensities because they were "close friends, close acquaintances, close relations." But no evidence of Russell's violent propensities or the closeness of his relationship with Moore was ever presented to the jury.

Even if this evidence supports a finding of reckless indifference for an adult, it is not sufficient to establish that Moore, who was 16 at the time of the shooting, had the requisite mental state.  It is well recognized that "[c]hildren 'generally are less mature and responsible than adults' " and " 'often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them' . . . ." (*J. D. B. v. North Carolina* (2011) 564 U.S. 261, 272 (*J. D. B.*).)  As a result, "[t]he law has historically reflected the same assumption that children characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them." (*Id.* at p. 273.)  This is so "even where a 'reasonable person' standard otherwise applies . . . ." (*Id.* at p. 274.)  Thus, " 'the background and mental and emotional development of a youthful defendant [must] be duly considered' in assessing his culpability." (*Miller v. Alabama* (2012) 567 U.S. 460, 476 (*Miller*).)  And "criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." (*Graham v. Florida* (2010) 560 U.S. 48, 76.)

Consistent with these principles, at least one Court of Appeal has considered a defendant's youth when determining whether the defendant was a major participant under section 190.2, subdivision (d). (*People v. Harris* (2021) 60 Cal.App.5th 939, 960.)  We go one step further and hold that a defendant's youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life.  Indeed, the "hallmark features" of youth—"among them, immaturity, impetuosity, and failure to appreciate risks and consequences"—are arguably more germane to a juvenile's mental state than to his or her conduct. (*Miller, supra*, 567 U.S. at p. 477.)

23

In this case, Moore, as a 16-year-old, lacked " 'the experience, perspective, and judgment' " to adequately appreciate the risk of death posed by his criminal activities. (*J. D. B., supra*, 564 U.S. at p. 272; see *Miller, supra*, 567 U.S. at p. 477.) To the extent the *Clark* factors discussed *ante* support a finding of reckless indifference for an adult—an issue we do not decide today—those factors undoubtedly preclude such a finding when viewed from the lens of Moore's youth. In particular, we cannot conclude beyond a reasonable doubt that Moore was subjectively aware that his actions created a graver risk of death than any other armed robbery.[10] (*Scoggins, supra*, 9 Cal.5th at p. 677.)

The People do not dispute that Moore's age is relevant when determining whether he acted with reckless indifference to human life. They, however, contend Moore's youth bears on his "subjective mental state" only to the extent that it affects his awareness of the dangers posed by his conduct. As a result, they argue, "Unless [Moore's] youth conclusively ruled out any reasonable inference on a subjective factor, such as that he acted with reckless indifference, the factor is analytically inapplicable."

The People's attempt to downplay Moore's youth, however, ignores our high court's guidance in *Banks*, *Clark*, and *Scoggins*. As those cases explain, in determining whether a defendant acted with reckless indifference to human life, we must "consider the totality of the circumstances." (*Banks, supra*, 61 Cal.4th at p. 802.) Thus, the factors identified in *Banks* and *Clark* are "nonexclusive" (*Taylor, supra*, 34 Cal.App.5th at p. 552)—with " '[n]o one' " factor being " 'necessary' " or " 'necessarily sufficient' " (*Clark, supra*, 63

_____

[10] Because we find insufficient evidence to establish the subjective element of reckless indifference, we do not address the objective element. (*Scoggins, supra*, 9 Cal.5th at p. 677; see *J. D. B., supra*, 564 U.S. at p. 274 [observing that youth is relevant even if standard is objective].)

24

Cal.4th at p. 618). Considering the totality of the circumstances, including Moore's youth at the time of his offenses, we conclude that no rational trier of fact could find that Moore acted with reckless indifference to human life.[11]

## DISPOSITION

Moore's petition for writ of habeas corpus is granted. The true finding on the robbery-murder special-circumstance allegation under section 190.2, subdivision (a)(17)(A) is vacated. The matter is remanded with directions to resentence Moore consistent with the views expressed in this opinion.

---

[11] Because we vacate the robbery-murder special-circumstance finding for insufficiency of the evidence, we do not address Moore's argument that this finding is categorically barred by the federal and state Constitutions.

_____
Chou, J.*

WE CONCUR:


_____
Petrou, Acting P. J.


_____
Jackson, J.†


A154032/*In re Deandre Lamar Moore*

_____

\* Judge of the Superior Court of San Mateo County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

† Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A154032/In re Deandre Lamar Moore

Trial Court:        Superior Court of San Mateo County

Trial Judge:        Mark R. Forcum

Counsel:        Michael J. Brennan and Heidi L. Rummel for Petitioner.

                Xavier Becerra, Attorney General, Lance E. Winters and Jeffrey M. Laurence, Assistant Attorneys General, Donna M. Provenzano and David H. Rose, Deputy Attorneys General, for Respondent.